IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Christopher Bernard Darrell,

Movant/Defendant,

v.

United States of America,

Respondent/Plaintiff.

No. CV-17-02143-PHX-JAT (BSB)
CR-14-00500-PHX-JAT

REPORT AND
RECOMMENDATION

Movant/Defendant Christopher Bernard Darrell (Defendant), has filed a Motion to Vacate, Set Aside, or Correct Sentence by a person in Federal Custody pursuant to 28 U.S.C. § 2255, and a supporting memorandum.  (Docs. 1, 2.)[1]   Respondent/Plaintiff, the United States of America (the government), has filed a response asserting that the § 2255 motion should be denied.  (Doc. 6.)  Defendant has filed a reply in support of his § 2255 motion.  (Doc. 7.)  For the reasons set forth below the Court recommends that relief be denied.

I.      Factual and Procedural Background

        A.      Charges, Trial, and Sentencing

        On April 9, 2014, a federal grand jury returned an indictment against Defendant and co-defendant Lorenzo Alexander Villa charging them each with one count of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 1153 and 113(a)(3) (Count 1), one

_____

        [1]  Citations to "Doc." are to filings in CV-17-02143-PHX-JAT (BSB).  Citations to "CR Doc." are to filings in CR-14-00500-PHX-JAT.

count of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6) (Count 2), and one count of robbery, in violation of 18 U.S.C. §§ 1153 and 2111 (Count 3). (CR Doc. 1.) After a three-day jury trial, Defendant was found guilty on all three counts. (CR Doc. 88.) On June 4, 2015, the Court sentenced Defendant to a total of 188 months' imprisonment, followed by a three-year term of supervised release. (CR Doc. 115.) The convictions were based on the events set forth below.

### B.    Evidence Presented at Trial

On August 31, 2013, Defendant and the victim, P.V., met at a party at a house on the Gila River Indian Community. (RT 2/3/15 57-58.)[2] Defendant asked P.V. for a ride home. At about 1:00 a.m. on September 1, 2013, they left together in P.V.'s white 2003 Honda Civic and went to P.V.'s house where they drank beer and smoked methamphetamine until sunrise. (*Id*. at 59.) That morning, September 1, 2013, Defendant and P.V. went back to the Gila River Indian Community and tried to buy marijuana at two locations before stopping at the residence of Sih-Ki Norris where they again tried to buy marijuana. (*Id*. at 60-63.) There P.V. met Villa (the co-defendant in this matter) for the first time. Defendant, Villa, P.V. and other people who were at Norris' house smoked methamphetamine that morning. (*Id*. at 61 63; RT 2/4/15 116.) Later that day, Defendant, Villa, and P.V. drove in P.V.'s car to buy wine and marijuana. (RT 2/3/15 64.) They later drank wine and smoked marijuana at Norris' house. (*Id*. 66, 115.)

While they were at Norris' house, Defendant texted Villa and suggested that they steal P.V.'s car. (RT 2/4/15 132.) Villa did not respond to the text. (*Id*. at 133.) Later in the evening, Defendant, Villa, P.V. and another person who was at Norris' house, Thomas Trujillo, left in P.V.'s car. (RT 2/3/15 67; RT 2/4/15 126.) While riding in the car, Villa indicated to Defendant, by mouthing words and eye contact, that he agreed that they should steal the car. (RT 2/4/15 130-133.)

---

[2] Citations to RT 2/3/15 are to the trial transcript at CR Doc. 131. Citations to RT 2/4/15 are to the trial transcript at CR Doc. 132.

When P.V. stopped the car on a dirt road to let Trujillo out to urinate, Villa indicated to Defendant that it was the time that they should steal the car. (RT 2/4/15 130, 134.) Villa testified that he was seated in the front passenger seat and that he punched P.V. in the face four times. (*Id.* at 134.) Villa testified that Defendant, who was seated in the back seat, grabbed P.V.'s shoulders and held him down. (*Id.* at 135.) Villa testified that Defendant then cut P.V.'s neck with a pocketknife. (*Id.* at 121, 135.) Defendant handed the knife to Villa, who stabbed P.V. in his side. (*Id.* at 135-36.) Villa testified that Defendant then got out of the car and tried to pull P.V. out of the driver's seat. (*Id.* at 136-37.) Villa helped Defendant pull P.V. out of the car. (*Id.* at 137.)

The victim, P.V., testified that at the time of the assault three men were in his car with him, who he identified as Defendant, Villa, and "some other guy." (RT 2/3/15 67.) P.V. testified that Villa was in the front seat. (*Id.* at 67, 88.) Defendant was in the back seat with the "other guy."[3] (*Id.* at 67-68, 70, 74, 88.) While P.V. was driving, Villa told P.V. to pull over and he pulled into the "front drive" by a house. (*Id.* at 69.) P.V. testified that, after he put the car in park, Villa stabbed him in the chest. (*Id.* at 70.) P.V. further testified that all three of the men in the car participated in the assault and that he was stabbed, his throat was cut, and he was punched. (*Id.* at 70-74.) P.V. was unsure which of the three men had cut his throat. (*Id.* at 71, 74.) He testified that Defendant "punched [him] from the front window" and caused facial injuries, including a split lip. (*Id.* at 71, 72-73, 75, 82, 86, 98.)

After Defendant and Villa pulled P.V. out of the car, Defendant kicked him. (RT 2/4/15 137.) Defendant then drove the car away from the scene, with Villa and Trujillo in the back seat, leaving P.V. crawling on the dirt road. (*Id.* at 137-138, 149-50.) Defendant drove back to Norris' house where Villa briefly went inside and then returned and got back in the car. (*Id.* at 150-52.) Villa testified that Defendant parked the car

---

[3] P.V. identified Defendant during trial and in a photographic line up. (RT 2/3/15 at 93, 94.) He testified that he identified Defendant "very quickly" because he had multiple opportunities to see him very closely, even though he had only known him for a few days. (*Id.* at 94.)

about two minutes down the road, behind Villa's dad's house.  (RT 2/4/15 153.)  Villa testified that Defendant and Trujillo cleaned the car by wiping off fingerprints with their shirts.  (*Id*. at 153-56.)  Villa pulled the radio out of the car with the intent to leave the reservation and sell the radio in Phoenix.  (*Id*. at 156.)

After the attack, P.V. walked to the nearest house and asked for help.  (RT 2/3/15 19, 73.)  The occupants of the house called 911.  (*Id*. at 19, 20.)  The police arrived about five minutes later, at around 9:40 p.m., and found P.V. screaming with his hand over his right pectoral area.  (*Id*. at 38-41, 75.)  When police asked P.V. for his name and for information on who injured him, P.V. motioned towards his wallet, which contained his photo identification and a business card with the name "Lorenzo Villa" written on it.  (*Id*. at 41-42.)  The police department began an investigation and a search for Villa.  (*Id*. at 47-48.)  After police searched Norris' house and did not find Villa or other evidence, they began a search of the desert area west of the house.  (RT 2/4/15 47.)  During this search police found Defendant hiding under a flat utility trailer.  (*Id*. at 47-50.)

Defendant was arrested on an unrelated warrant and searched.  He had a key to a Honda and a small remote for a radio in his pocket.  (*Id*. at 49.)  The police searched the area in a helicopter and located P.V.'s stolen Honda.  The car had been abandoned approximately one-half mile from where police found Defendant.  (*Id*. at 61, 64, 73.)  The key found in Defendant's pocket operated P.V.'s Honda.  (*Id*. at 50, 65.)  Defendant's clothes were inspected for evidence of blood and two blood spots were found on his shorts.  (*Id*. at 184-86.)

A criminalist in the DNA and serology unit at the Arizona Department of Public Safety crime lab testified that she compared the blood found on Defendant's shorts to DNA samples from Defendant, Villa, and P.V.  (*Id*. at 188-89, 192.)  The criminalist testified that she determined that the blood from Defendant's shorts matched P.V.'s DNA profile.  (*Id*. at 196.)  She further testified that the chance of finding a random person with this DNA profile, depending on the person's race, was "1 in 15 quadrillion Caucasians, 1

in 19 quintillion African Americans, 1 in 680 quadrillion Hispanics, 1 in 1.1 quintillion Apache, and 1 in 280 quadrillion Navajo." (RT 2/4/15 196-97.)

### C.      Direct Appeal

Defendant sought review in the Ninth Circuit Court of Appeals, arguing that: (1) the Court abused its discretion or denied his Sixth Amendment right to counsel when it denied his motion to substitute counsel; (2) he was denied effective assistance of counsel at trial; and (3) the prosecutor engaged in misconduct during his closing statement by placing the burden of proof on Defendant. (Doc. 6 at 5.)  In an unpublished decision, the Ninth Circuit held that the district court did not abuse its discretion or deny Defendant his Sixth Amendment right to counsel because no irreconcilable conflict existed between Defendant and his counsel, Defendant's ineffective assistance of counsel claim did not meet any of the exceptions to be considered on appeal, and the prosecutor did not engage in misconduct because the prosecutor's challenged statements were general comments on the evidence. *United States v. Darrell*, 659 Fed. App'x. 407 (9th Cir. 2016).  The Ninth Circuit affirmed Defendant's convictions and sentences. *Id.*

### D.      § 2255 Motion

On July 5, 2017, Defendant filed a § 2255 motion and a supporting memorandum in this Court. (Docs. 1, 2.)  Defendant presents one ground for relief in which he asserts that defense counsel was ineffective for failing to produce evidence at trial, specifically Defendant's testimony and the testimony of a particular witness, to support a theory that counsel mentioned during his opening statement. (Doc. 1 at 5; Doc. 2 at 1.)  As set forth below, Defendant is not entitled to relief on this claim.

## II.     Ineffective Assistance of Counsel

The controlling Supreme Court precedent on claims of ineffective assistance of counsel is *Strickland v. Washington,* 466 U.S. 668 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the petitioner. *Id.* at 687.  To be deficient, counsel's performance must fall "outside the wide range of

professionally competent assistance." *Id.* at 690. When reviewing counsel's performance, the court engages a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* The court's review of counsel's performance is extremely limited. Acts or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance of counsel. *Id*.

To establish a Sixth Amendment violation, a petitioner must also establish that he suffered prejudice as a result of counsel's deficient performance. *Id*. at 691-92. To show prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The court need not address both *Strickland* requirements if the petitioner makes an insufficient showing on one. *See id.* at 697 (explaining that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) (stating that "[f]ailure to satisfy either prong of the *Strickland* test obviates the need to consider the other") (citing *Strickland*, 466 U.S. at 688).

## III. Defendant's Claim

Defendant asserts that defense counsel was ineffective because during his opening statement he told the jury about a defense theory, but he did not present evidence to support that theory during trial. (Docs. 1, 2.) Defendant asserts that his testimony and the testimony of Kiki Norris would have provided evidence to support this theory. Defendant claims that counsel was ineffective for failing to locate and interview Kiki Norris before trial, and for failing to have Defendant testify even though Defendant wanted to testify in his own defense. (Doc. 2 at 2.) Defendant asserts that defense counsel told the jury in his opening statement that Defendant denied knowing P.V., and denied seeing P.V. and Villa on the day of the incident. (Doc. 2 at 3.) Therefore, Defendant claims that counsel's "failure to produce the denials called attention to" Defendant's failure to testify and "compromised his right to be presumed innocent, and to

remain silent." (Doc. 2 at 7.)  In his reply, Defendant further asserts that he did not waive his right to testify.  (Doc. 7 at 2.)

### A.      Failure to Locate and Interview Witness

During his opening statement, defense counsel told the jury that on the day of the incident Defendant had been working on a car when "a female that he didn't know really well" approached him and "asked him to hold some keys and to look after a white car that was parked nearby." (RT 2/3/15 at 12.)  Defense counsel stated that Defendant took the keys and entered the car.  (*Id*.)  Defense counsel further stated that Defendant admitted he went in the car and that he had the keys, but that he was not involved with the events involving the victim, P.V.  (*Id*.)

Defendant contends that the female who approached him was KiKi Norris, and that her testimony would have explained why Defendant had P.V.'s blood on his clothing and possessed P.V.'s car keys.  (*Id*. at 3-4.)  Defendant also argues that he would have testified that he entered the car after the crime, and his testimony also would have explained the presence of P.V.'s blood on his clothing.  (*Id*. at 4.)  Defendant argues that defense counsel's failure to interview KiKi Norris before trial, and his failure to present her testimony at trial, prejudiced him because the jury likely drew a negative inference against Defendant when counsel did not provide testimony to support the theory of defense that he provided during his opening statement.  (Doc. 2 at 6-8.)

In response to the § 2255 motion, the government offers the affidavit of defense counsel John McBee.  (Doc. 6, Ex. 1.)  McBee explains that he did not interview Kiki Norris before trial because Defendant had not provided enough information to locate her.  (*Id*. at ¶ 2.)  Defendant told McBee about the potential witness, but could not provide her address, contact information, her known associates, or other physical description to help counsel locate her.  (*Id*.)

McBee also states that he grew skeptical about whether the female witness existed because Defendant told him that he was not sure of her real name, and gave inconsistent descriptions of the story the female witness would tell.  (*Id*.)  Therefore, McBee

developed a trial strategy that did not include the female witness. (*Id*. at ¶¶ 3, 4.) McBee explains that he included information about that witness in the opening statement because he planned to have Defendant testify about his version of the events, including his interaction with the female witness. (*Id*. at ¶ 5.) Defense counsel explains that his opening statement was supposed to be corroborated by Defendant's testimony, and "the defense was built around the Defendant's planned testimony at trial." (Doc. 6, Ex. 1 at ¶ 5.) At trial, when it was time for Defendant to testify, he did not want to testify. (*Id*.) Defense counsel states that he did not prevent Defendant from testifying and had presumed he would testify "based on all discussion of strategy up to that juncture." (*Id*.) In his § 2255 motion, Defendant states that before trial he "asserted that he wanted to testify in his own defense." (Doc. 1 at 2.) Defendant claims that he did not waive his right to testify, but he does not specifically respond to defense counsel's assertion that Defendant's testimony at trial was "planned." (Doc. 6, Ex. 1 at ¶ 5.)

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Counsel's "duty to investigate," however, is not "limitless" and does not "necessarily require that every conceivable witness be interviewed" or "every path" pursued. *Hamilton v. Ayers*, 583 F.3d 1100, 1129 (9th Cir. 2009) (internal quotation marks omitted). Further, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

The government argues that defense counsel did not perform deficiently by failing to interview the female witness before trial because Defendant had not provided sufficient information from which counsel could have identified and located her. Defendant does not dispute that assertion, but claims that "KiKi" was mentioned by a government witness several times and, therefore, defense counsel should have located and interviewed her. (Doc. 7 at 2, 7-8.) To support this assertion, Defendant cites a Gila

River Police Department (GRPD) supplemental report that includes a narrative of an interview with co-defendant Villa. (*Id*. at 7-8.) According to the supplemental report, Villa told the police investigator that his girlfriend KiKi's mother was a judge in the Gila River Indian Community, but Villa could not provide the last name of his girlfriend or her mother. (*Id*. at 7.) Villa also stated that one time when Defendant "provided transportation to [Villa] and Kiki, Kiki's mother told them the vehicle [Defendant] was driving was stolen." (*Id*. at 8.) Villa also stated that on the day of the incident, Defendant brought a white male to Kiki's house. (*Id*.) Villa stated that Kiki, a Mexican male, the white male, and Defendant smoked methamphetamine. (*Id*. at 7-12.) Kiki and Villa stayed at the house when Defendant, the white male, and a Mexican male left in a white car to buy more methamphetamine. (*Id*. at 9-10.) About twenty minutes later, Defendant and the Mexican male returned with blood on their clothing, and then they left again in the white car. (*Id*.)

Although the GRPD supplemental report mentioned a person named Kiki, it did not provide any contact information for her and did not support Defendant's statements about Kiki's alleged conduct on the day of the incident. Rather, it indicated that Kiki may have provided information that was harmful to Defendant. Based on the lack of details about Kiki's last name, and reasonable information about where or how she could be contacted, the Court concludes that defense counsel did not perform deficiently by failing to interview her before trial.

Additionally, the government argues that defense counsel was not deficient for mentioning the female witness during his opening statement because he expected Defendant to testify about his interaction with her and, therefore, defense counsel did not falsely promise the jury that he would present the female witness. Defendant asserts that before trial he "asserted that he wanted to testify in his own defense."[4] (Doc. 2 at 2.) Defendant states that he "would've testified he received the property from the female."

---

[4] Defendant refers to an "attached affidavit," but there is no affidavit attached to the filing. (Doc. 2 at 2.)

(*Id*. at 4.)   Based on Defendant's own assertions that he would have testified about his interactions with the female witness, counsel did not perform deficiently by mentioning Defendant's alleged interaction with that individual during his opening statement.

### B.   Obstructing Defendant's Right to Testify

Liberally construing the § 2255 motion, Defendant argues that counsel was ineffective because he prevented Defendant from testifying at trial.  A criminal defendant has the constitutional right to testify on his own behalf.  *Rock v. Arkansas*, 483 U.S. 44, 52 (1987) ("Even more fundamental to a personal defense than the right of self-representation . . . is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.").  A defendant's relinquishment of his right to testify must be knowing and intentional.  *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).  However, a defendant's waiver of his right to testify need not be explicit. *Id.*  Rather, "waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so."  *Pino-Noriega*, 189 F.3d at 1095 (citing *Joelson*, 7 F.3d at 177).  A defendant's claim that his counsel denied him the right to testify is analyzed under the ineffective assistance of counsel standard of *Strickland*.  *See Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007) (en banc).

Defendant states that before trial he indicated that he wanted to testify in his own defense and that he would have denied involvement in the incident, explained why he had P.V.'s car keys, and explained why he had P.V.'s blood on his clothes.  (Doc. 2 at 2-4.) Defendant asserts that counsel did not present his "denials" during trial.  (*Id*. at 7.)  In his reply, Defendant asserts that he did not waive his right to testify.  (Doc. 7 at 2.)  In his affidavit, defense counsel states that "the defense was built around the Defendant's planned testimony at trial."  (Doc. 6, Ex. 1 at ¶ 5.)  Defense counsel does not dispute that Defendant wanted to testify at trial.  (Doc. 6, Ex. 1.)  Rather, he states that "at the close of

the [government's] case, [Defendant] indicated that he did not want to testify." (*Id*.) Defense counsel states that he did not prevent Defendant from testifying. (*Id*.)

The Court does not need to resolve whether defense counsel prevented Defendant from testifying and thus rendered deficient performance because, as set forth below, Defendant has not established prejudice. *See Rios*, 299 F.3d at 805. Defendant has not shown "that there is a reasonable probability that, but for counsel's [alleged failure to permit him to testify], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

At trial, the government presented testimony that Defendant was in the car at that time of the incident, that he participated in the assault on the victim, P.V., and participated in taking P.V.'s car. Although some of that testimony came from the co-defendant Villa, who testified pursuant to a plea agreement, the jury was provided that information and was able to assess its impact on Villa's credibility. (RT 2/4/15 102-39.) Villa acknowledged that he pleaded guilty to one count regarding the incident at issue and that he had not been sentenced. (*Id*. at 105.) Villa further acknowledged that he had provided information to the government pursuant to an agreement, which provided that if the court accepted his plea, the government would move to dismiss two other counts against him. (*Id*. at 105-07.) Villa testified that he stabbed P.V. in the chest, and that Defendant cut his neck. (*Id*. at 120-21, 134-36.) Villa testified that he and Defendant pulled P.V. out of the car and Defendant kicked him. (*Id*. at 136-38.)

In addition to Villa's testimony, P.V. testified that Defendant was in the car and participated in the assault. (RT 2/3/15 67, 70-74.) P.V. testified that he was stabbed, his throat was cut, and he was punched. (*Id*. at 70-74.) P.V. was not sure which of the assailants cut his throat. (*Id*. at 71, 74.) P.V. testified that Defendant "punched [him] from the front window" and caused facial injuries, including a split lip. (*Id*. at 71, 72-73, 75, 82, 86, 98.) The government also presented police testimony that Defendant was found hiding less than a mile from where P.V.'s car was found, he had the car keys in his

pocket, and he had P.V.'s blood on his clothes. (RT 2/4/2015 17-18, 21, 29-31, 47-50, 52, 64-65, 70-71, 72, 73, 85.)

Defendant states that he would have testified that he did not know P.V., and that he did not see P.V. or Villa on the day of the incident. (Doc. 2 at 3.) Defendant would have testified that on the day of the incident, he was working on his car, when a female approached him and asked him to "hold on to some keys, and look after a white car." (*Id*.) He would have testified that he "accepted the keys and entered the vehicle." (*Id*.) Even assuming that defense counsel's performance fell below an objective standard of reasonableness in preventing Defendant from testifying, Defendant has not shown that there is a reasonable probability that "but for counsel's unprofessional errors, the result would have been different." *Strickland*, 466 U.S. at 697.

At trial, the victim, P.V., and co-defendant, Villa, gave similar accounts of the events leading up to the assault and about Defendant's role in the incident. (*Compare* RT 2/3/15 at 50-75 *with* RT 2/4/15 102-39.) Both testified that Defendant was involved in the assault and that he cut or punched P.V. Additionally, Defendant was found hiding less than a mile from where P.V.'s car was found with the car key in his pocket and P.V.'s blood on his clothes. Defendant has not shown a reasonable probability that had the jury heard his testimony, which gave an uncorroborated version of the events, there is a reasonable probability that the result of his trial would have been different. Therefore, he is not entitled to relief on his claim of ineffective assistance of counsel based on his assertion that defense counsel prevented him from testifying.

**IV.    Conclusion**

The Court finds that Defendant has failed to establish that he is entitled to § 2255 relief based the claims asserted in the § 2255 motion and the supporting memorandum. (Doc. 1, 2.) Therefore, the Court recommends that the § 2255 motion be denied.

Accordingly,

**IT IS RECOMMENDED** that the Motion to Vacate, Set Aside, or Correct Sentence (Doc. 1) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED.**

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6, 72. The parties have fourteen days within which to file a response to the objections. Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Fed. R. Civ. P. 72.

Dated this 21st day of March, 2018.

_____
Bridget S. Bade
United States Magistrate Judge